```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


EVERITT, PRATT & LATHAM, L.L.P.                CIVIL ACTION
and EVERITT, PRATT, LATHAM &
DONOVAN, L.L.P.

v.                                             NO. 05-0576


JACK PIERCE BROOK                              SECTION "F"
```

ORDER AND REASONS

Before the Court are several motions by both parties. The plaintiff has filed (1) a motion for summary judgment, (2) a motion to strike certain evidence submitted by the defendant on summary judgment, and (3) a motion to dismiss the defendant's counterclaim. The defendant has filed a cross-motion for summary judgment. For the reasons that follow, the defendant's cross-motion for summary judgment is GRANTED, the plaintiff's motion to dismiss the defendant's counterclaim is DENIED as moot, and the plaintiff's motion to strike is DENIED as moot.

Background

This case arises out of a dispute between former colleagues who worked together at the same law firm. Their dispute turns on the interpretation and enforceability of a contract that allocates fees earned for legal services. The individuals who make up the plaintiff law firm, were formerly associated with Jack Brook, the

1

defendant, in the defendant's former law firm of Brook, van Loon, & Latham.  Brook, van Loon, & Latham had represented and performed work on behalf of such clients as the Louisiana Department of Justice and the Louisiana Office of Risk Management.  Mr. Brook had himself generated the representation of these clients in numerous cases and contracts for services.

When the individuals who now are the plaintiff law firm separated from the defendant and his law firm, the parties executed the Brook, van Loon, & Latham File Allocation Agreement in November 2002 (the "Agreement").  The Agreement provides that: (i) the defendant would voluntarily withdraw from existing cases and files that he had originated for the Louisiana Department of Justice and the Office of Risk Management (the "State Cases"); (ii) the State Cases would be reassigned to the plaintiff law firm;  (iii) the defendant would receive 20% of future fees on the State Cases; and (iv) the defendant would become "Special Counsel" to the plaintiff law firm "for the limited purpose of providing advice and consultation to Everitt on [the State Cases]."

Both the Louisiana Attorney General and the Office of Risk Management approved the Agreement.  On November 6, 2002, by joint letter, the plaintiff law firm and the defendant memorialized their notice to the State of Louisiana that the plaintiff and defendant were separating from each other and that they had executed the Agreement.  Importantly, in addition to notifying the State that

the existing cases would be reassigned to the plaintiff law firm, the letter also provided, in part:

> In accordance with a File Allocation Agreement, which we have entered, the provisions of Rule 1.5(e) of the Louisiana Rules of Professional Conduct,...we advise you that Brook will receive a portion of all future legal fees on these existing files.... Under this agreement, Brook will become special counsel for the limited purpose of rendering advice and consultation on these cases only.

Brook never gave any advice regarding the State Cases; nor did the plaintiff law firm ever seek any advice from him on such cases. Nevertheless, the plaintiff law firm sent Brook 36 checks, totaling $206,653.50, which represented 20% of the fees generated on the State Cases pursuant to the Agreement. By letter dated March 5, 2004 the plaintiff law firm advised Brook that it was terminating the Agreement because Brook never "assumed joint responsibility for the representation of the client/s...[nor] rendered any meaningful services [on the existing cases]" (the "Termination Letter").

On February 10, 2005, Brook sued the plaintiff law firm in state court. One week later, the plaintiff law firm filed this lawsuit, alleging breach of contract and misrepresentation, seeking to rescind the Agreement and recover the 36 payments made to Brook pursuant to the Agreement. On March 14, 2005, Brook moved to dismiss for lack of subject matter jurisdiction, which this Court denied. On July 1, 2005, Brook asserted a counterclaim, seeking

specific performance of the Agreement.

Having both filed motions for summary judgment, the plaintiff law firm and the defendant agree that this lawsuit is ripe for disposition and that no serious issues of material fact are in dispute.

## I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment." Amoco Prod. Co. v. Texas Meridian Resources Exploration, Inc., 180 F.3d 664, 668 (5th Cir. 1999). Under Louisiana law, whether a contract is ambiguous is an issue of law for the Court. Hampton v. Hampton, Inc., 713 So.2d 1185, 1189 (La.App. 1st Cir. 1998). And, the interpretation of an unambiguous

4

contract is an issue of law for the court. See Texas Eastern Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998).

Louisiana's statutory rules of contract construction are well-settled. Louisiana Civil Code article 2046 limits the Court's authority to look beyond the four corners of an unambiguous contract. La.Civ.Code Ann. art 2046 ("[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent"). "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Amoco Prod., 180 F.3d at 668-69 (quotation omitted). By contrast, "a contract is ambiguous, under Louisiana law, 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.'" Texas Eastern, 145 F.3d at 741 (quoting Lloyds of London v. Transcontinental Pipe Line Corp., 101 F.3d 425, 429 (5th Cir. 1996)).

Under settled principles of contract construction, the Court is tasked with determining the common intent of the parties. La.Civ.Code Ann. art. 2045. To accomplish this, the Court reads contracts for their plain meaning. La.Civ.Code Ann. art. 2047. In addition, the Court must construe "[e]ach provision...in light of

the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code Ann. art. 2050. The Court must interpret contract provisions susceptible to different meanings "to avoid neutralizing or ignoring any of them or treating them as surplusage" and "to preserve validity [of the contract]." Lambert v. Maryland Cas. Co., 418 So.2d 553, 559-60 (La. 1982); Gibbs Constr. Co. v. Thomas, 500 So.2d 764, 769 (La. 1987).

II. Application

The only two issues for this Court are: (A) whether the Agreement, by its own terms, requires Brook to actually (and actively) render advice on the existing cases in order to receive the 20% payments; and (B) if not, whether the Agreement is enforceable under Louisiana law.

A.

Guided by the foregoing principles of contract construction, the Court first examines the parties' Fee Allocation Agreement to determine whether it requires Brook to actually (and actively) render advice to the plaintiff on the State Cases. In the Agreement, the parties articulate their intention "to clarify [the plaintiff's and defendant's] respective rights, duties and obligations with respect to the existing [State Cases]." The Agreement acknowledges that Brook "has originated numerous cases and contracts for legal services from [the State], a number of which cases and files are still open" and that "Latham [one of the

6

attorneys of the plaintiff law firm] had no ownership in the [State Cases]."

Pursuant to the Agreement, Brook must voluntarily withdraw from the State Cases, which are to be reassigned to the plaintiff. Consistent with this reassignment, the Agreement expressly provides that the plaintiff law firm will assume full responsibility for all State Case files and electronic materials, which will be transferred to the new firm.

Various provisions of the Agreement address Brook's compensation for turning over the State Cases as well as his new role with regard to the State Cases.  Because the parties' dispute turns on the meaning and enforceability of the contract provisions, it is appropriate to reproduce and discuss them in detail. Regarding compensation, Paragraph 3 of the Agreement provides:

> All sums due for services rendered and expenses incurred on the existing [State Cases] prior to September 16, 2002 shall be paid to Brook.  Brook will receive twenty percent (20%) of all future fees on the existing files and cases and any replacement, renewal or substitute contracts issued pertaining to the existing [State Cases].[1]

---

[1] Paragraph 2, which lists the parties rights and responsibilities as they will be relayed to the client (the State), provides that "Brook will receive a portion of future fees on all the existing files and cases."  Paragraph 5 states the procedure plaintiff must follow in remitting Brook's 20% payment and also provides for liquidated damages and attorney's fees in favor of Brook if the plaintiff fails to pay the proper amount under the Agreement.

Brook's role, which is defined in Paragraph 6, nominates Brook to serve as

> Special Counsel to [the plaintiff law firm] for the limited purpose of providing advice and consultation to [the plaintiff law firm] on [State Cases] only.... Brook's position as Special Counsel shall not be placed on [the plaintiff law firm's] letterhead or on any pleading or other documents filed in the records on the [State Cases], and[] Brook shall not be permitted to use [the plaintiff law firm's] letterhead for any purpose. Brook and [the plaintiff law firm] further agree that neither of them will have any interest in the other firm nor any responsibility for the actions or inactions of the other.

An additional provision addressing compensation, Paragraph 7, provides:

> Brook reserves the right to bill for work done under the existing [State Cases] by Brook between the dates of September 16, 2002 and the date of this agreement, and such bills will not be subject to this agreement. Brook shall be paid for the contract rate for any work done on the existing files and cases at the request of [the plaintiff], the Louisiana Department of Justice or the Office of Risk Management and any such fees shall not be subject to this agreement.

The plaintiff contends that these provisions unambiguously condition Brook's eligibility to receive 20% of the fees on Brook's actual/affirmative involvement in the State Cases. According to the plaintiff, Brook's failure "to provide services or shared responsibility", which is undisputed, disqualifies him from receiving 20% of the fees collected on the State Cases. The Court

finds that the plaintiff's interpretation is mistaken and disregards the contract's text; it is betrayed by the express provisions of the contract.

Nowhere in the Agreement is Brook required to provide services or shared responsibility in order to receive 20% of <u>future</u> fees.[2] Rather, only the first sentences of Paragraphs 3 and 7 refer to "services rendered" or "work done" by Brook and those provisions are expressly limited to services rendered by Brook before the files are turned over or the Agreement takes effect. Contrast those provisions with the unconditional text of the second sentence of Paragraph 3: "Brook will receive twenty percent (20%) of all future fees on the [State Cases]...." Unlike the payment provisions applicable to Brook before he turned over the State Cases, there is no express requirement for "services rendered" or "work done" in exchange for 20% of future fees.[3] Had the parties

---

[2] As for the plaintiff's contention that the Agreement mandates that Brook assume some responsibility for the cases, the plaintiff and Brook actually disclaimed any responsibility "for the actions or inactions of the other." Moreover, the Agreement required that Brook voluntarily withdraw from the State Cases and that his "position as Special Counsel shall not be placed on" the plaintiff's letterhead or on any documents for the State Cases.

[3] The Court notes that the plaintiff's argument is flawed because it fails to give meaning (let alone credit) to Brook's relinquishment of cases that he originated, which is the articulated purpose of the Agreement. If the Court followed the plaintiff's argument to its logical conclusion, Brook was owed nothing for his relinquishment of the State Cases. This would be true in spite of the obvious value conferred on the plaintiff, as evidenced by the relief they seek (disgorgement of 36 payments, totaling in excess of $200,000).

wished to impose an express requirement of work done or services to be performed, they could have (and, being lawyers, would have) done so.

The plaintiff's added contention that Brook must affirmatively, without any initiation or request for consultation from the plaintiff, render advice on the State Cases is absurd in light of other provisions of the Agreement, and common sense.  As expressly stated in the Agreement, Brook turned over the business he had originated in the form of the State Cases in exchange for a proportion of the future fees.  Brook withdrew from representing the clients in the State Cases and relinquished possession and responsibility over the files for those cases.  He maintained only a "limited role" as Special Counsel to the plaintiff.  Thus, as a practical matter, the plaintiff's suggestion that the onus was on Brook to initiate on his own the effort to advise the plaintiff regarding the cases for which he had relinquished all files is unreasonable and unrealistic.  The onus to request advice and consultation was on the law firm, not Brook.

In construing Paragraph 6's advice and consultation clause, to give it the meaning suggested by the contract as a whole, it is clear to the Court that the future interaction between the plaintiff and Brook was to be -- to invoke a term used by the parties in the Agreement -- "limited."  Moreover, the plain and ordinary import of the phrase "advice and consultation" presupposes

that the party seeking advice, here the new law firm, seeks to consult the special advisor, Brook, when advice or suggestions regarding a decision or course of conduct are needed.[4]

Thus, the rules of contract construction confirm that the parties intended that "Brook will receive twenty percent (20%) of all future fees on the existing files and cases and any replacement, renewal or substitute contracts issued pertaining to the existing [State Cases]."  Because this provision (and the Agreement as a whole) is unambiguous, resort to extrinsic evidence to determine the parties intent is obviated.[5]

Because the Court finds that the Agreement unambiguously mandates that 20% of all fees collected on the State Cases be allocated to Brook, the Court now analyzes whether such a provision comports with Louisiana public policy.

B.

---

[4] The Court notes that the Agreement's designation of Brook as special counsel contemplates a scenario not unlike the scenario when a client consults his lawyer for advice.  Just as it would be absurd for a lawyer to gratuitously call a client to offer advice without being engaged by the client and asked "what should I do", so too would it be odd for Brook, as special counsel, to call the plaintiff law firm and render unsolicited advice about a course of action he recommends.

[5] Even if the Agreement was ambiguous, the Court notes that the plaintiff's 36 payments to the defendant pursuant to the Agreement, notwithstanding Brook's so-called failure to render any services, would be strong evidence of the parties' intent that Brook is owed 20% of the future fees and that members of the law firm may seek his advice and consultation if they wish to do so on a limited basis.

Rule 1.5(e) of the Model Rules of Professional Conduct[6] precludes "[a] division of fee between lawyers who are not at the same firm" unless three conditions are met: "(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; (2) the client is advised and does not object to the participation of all the lawyers involved; and (3) the total fee is reasonable." This rule is aimed at full disclosure to the client that another lawyer is associated and will share in the fees. See, e.g., Roy v. Gravel, 570 So.2d 1175, 1185 (La.App. 3d Cir. 1990). Comment[8] to Rule 1.5 provides that "[p]aragraph (e) does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm."

The plaintiff contends that the Agreement, and especially the defendant's failure to render any services since its execution, violates the first condition, rendering the Agreement void. By contrast, Brook contends that Rule 1.5 is inapplicable under the facts because the rule does not prohibit partnership accounting and settlement agreements.[7] In any event, Brook contends that his

---

[6] The Louisiana State Bar Association has adopted the Model Rules at Article XVI of its by-laws.

[7] As stated above, the Agreement is unambiguous and, therefore, resort to extrinsic evidence submitted regarding whether the individuals comprising the plaintiff law firm were former partners of Brook is unnecessary to the Court's determination that the Agreement is valid.

designated role as Special Counsel further forecloses the plaintiff's contention that Rule 1.5 applies on these facts. Indeed, Rule 1.5 only applies to "lawyers not at the same firm."

The Court agrees with the defendant that the Agreement, while outside the scope of Rule 1.5, nonetheless accomplishes the client disclosure purpose of the rule.[8]  Accordingly, the Court finds that the Agreement is valid.  It is undisputed that, by written agreement, the plaintiff and Brook exchanged files for fees, advised and obtained consent from the client, and carved out a role, albeit limited, for Brook to participate in the future representation.  The Agreement required that Brook hand over something of value to him, the State Cases, in exchange for 20% of the future fees earned on those cases.  That the plaintiff has thus far not chosen to consult its special counsel regarding the State Cases is of no moment.  Written contracts are the law between the parties and the Court will not undermine the contract simply because, in hindsight, one of the parties wishes to undo the contract.  La.Civ.Code Ann. Art. 1983; Billingsley v. Bach Energy Corp., 588 So.2d 786, (La.App. 2d Cir. 1991).

This Court is presented with "a breach of contract action

---

[8] The plaintiff's contention that the defendant had a duty to involve himself in the case in order to share in the fee is without merit.  The Agreement and the law direct otherwise on these facts.  The Court notes that it is not presented with facts suggesting that the defendant refused to act as special counsel. Rather, it is undisputed that the plaintiff never sought, and the defendant never volunteered, any advice to the plaintiff on the State Cases.

between two knowledgeable parties [that] does not violate the Code of Professional Responsibility."  See Warner v. Carimi Law Firm, 725 So.2d 592, 596 (La.App. 5 Cir. 1998); see also Scurto v. Siegrist, 598 So.2d 507 (La.App. 1st Cir. 1992) (finding that suit to recover share in contingency fee where one attorney had been hired by another to assist in the representation of the client was a suit "to recover for breach of the agreement to share in the fund resulting from payment of the fee...not a suit for recovery of attorney's fees").  Most importantly, it is undisputed that the objectives of Rule 1.5 have been met:  the client was advised of, and agreed to, the Agreement.  See, e.g., Lawrence v. Wynne, 598 So.2d 1293, (La.App. 4th Cir. 1992) (upholding 75/25 fee-splitting agreement between lawyers who used to work at the same firm, notwithstanding that associate handled the settlement of the case that had originated with the partner and case settled after his departure).

### III.

In conclusion, the Court finds that the Agreement, unambiguously and without condition that puts the onus on Brook, requires the plaintiff to pay the defendant 20% of the fees earned from the State Cases.  The plaintiff breached the Agreement when it sent the Termination Letter and stopped payments to the defendant.  The Court further finds that the Agreement neither implicates nor offends Rule 1.5(e) of the Model Rules of Professional Conduct.

Therefore, the contract should be enforced as written, entitling the defendant to specific performance of the Agreement.

Accordingly, the plaintiff's motion for summary judgment is DENIED and the defendant's cross-motion for summary judgment is GRANTED. The plaintiff's motion to dismiss the defendant's counterclaim, which seeks specific performance of the File Allocation Agreement, is DENIED as moot, and the plaintiff's motion to strike is denied as moot.

The plaintiff's claim against the defendant is hereby dismissed with all costs taxed to the plaintiff law firm.

New Orleans, Louisiana, August 17, 2005.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE